FILED
2011 Sep-14  PM 02:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| JOHNNY C. BENNETT, JR., | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | **CASE NO. 2:09-cv-1723-SLB** |
| | } | |
| BROOKDALE SENIOR LIVING, | } | |
| INC., | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

The case is currently before the court on defendant Brookdale Senior Living, Inc.'s

("Brookdale") Motion for Summary Judgment, (Doc. 15).[1]  In his Complaint, (Doc. 1),

plaintiff Johnny C. Bennett, Jr. ("Bennett") asserts the following claims against

Brookdale: (1) discrimination and termination of employment on the basis of disability in

violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq.,

and (2) failure to reasonably accommodate a disability in violation of the ADA.  Upon

consideration of the record, the submissions of the parties, the arguments of counsel, and

the relevant law, the court is of the opinion that Brookdale's Motion for Summary

Judgment, (Doc. 15), is due to be granted with respect to both claims.

---

[1]  Reference to a document number, ["Doc. ___"], refers to the number assigned to each
document as it is filed in the court's record.

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("[I]t is never enough simply to state that the non-moving party cannot meet its burden at trial.").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)). Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

## II. STATEMENT OF FACTS[2]

Brookdale Place University Park is a retirement community for senior citizens that offers a variety of living accommodations for the elderly. (Doc. 17-4 at 44-45, Crauswell Depo.; Doc. 17-9 ¶ 3, Barber Decl.) Bennett has worked for Brookdale during two separate time periods. Bennett first worked at Brookdale's University Park facility from 2002 to 2005, when it was operated by American Retirement Corporation ("ARC") and

---

[2]As required when evaluating a motion for summary judgment, the court states the facts and all reasonable inferences arising from them in the light most favorable to Bennett, the nonmoving party. *See, e.g., Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citations omitted)).

3

known as Somerby at University Park.  (Doc. 17-1 at 40, Bennett Depo; Doc. 17-4 at 46-48, 117, Crauswell Depo.)  Around 2008, Brookdale Senior Living Corporation acquired ARC and the University Park facility was re-named Brookdale Place University Park. (Doc. 17-4 at 48, Crauswell Depo; Doc. 17-5 at 52, Barber Depo.)  In April 2008, Bennett started working at Brookdale again.  (Doc. 17-2 at 2, App. for Employment.)  Bennett's last day of employment at Brookdale was on September 26, 2008, when he claims he was terminated.  (Doc. 17-1 at 148, Bennett Depo.)

Brookdale gives all new employees a copy of the Brookdale Associate Handbook, which contains an anti-discrimination and anti-harassment policy.  (Doc. 17-3 at 7-8, Brookdale Associate Handbook; Doc. 17-9 ¶¶ 4-5, Barber Decl.)  The policy provides that employees who believe they have experienced discrimination should report it to, among others, a department manager, executive director, and/or the Human Resources Director.  (Doc. 17-3 at 8, Brookdale Associate Handbook; Doc. 17-9 ¶ 7, Barber Decl.) Brookdale maintains a toll-free hotline, the "Integrity Line," which employees may use to report discrimination.  (Doc. 17-3 at 8, Brookdale Associate Handbook; Doc. 17-9 ¶ 8, Barber Decl.)  Brookdale also has a disability accommodation policy, set forth in the Associate Handbook, which provides that qualified individuals with disabilities may request a reasonable accommodation from their supervisor or Human Resources and that a reasonable accommodation will be provided, except where the accommodation would create an undue hardship on Brookdale.  (Doc. 17-3 at 9, Brookdale Associate Handbook;

4

Doc. 17-9 ¶ 9, Barber Decl.)  In addition to receiving the Associate Handbook, Brookdale

employees attend an orientation session upon hire in which they receive instruction on

Brookdale's policies, including the anti-discrimination and anti-harassment policy.  (Doc.

17-3 at 12, Brookdale Associate Handbook; Doc. 17-9 ¶ 6, Barber Decl.)

Mike Crauswell, the Director of Plant Operations, hired Bennett as a Maintenance

Technician in 2002 and was his direct supervisor.  (Doc. 17-1 at 40, 55-56, Bennett

Depo.; Doc. 17-4 at 117-18, Crauswell Depo.)  As Maintenance Technician, Bennett

worked primarily as a painter, and also was responsible for performing general routine

preventive maintenance, such as basic plumbing and checking air filters throughout the

University Park facility.  (Doc. 17-1 at 56-57, 59, Bennett Depo.)  During this first period

of employment with Somerby from 2002 to 2005, another man, whose name Bennett

cannot recall, was also employed by Somerby as a painter.  (*Id.* at 40, 60.)  The two

typically painted separate areas of the building, though at times had to work together.  (*Id.*

at 60.)  Bennett never had any problems with Crauswell during Bennett's first period of

employment at Somerby, and Bennett received positive performance appraisals from

Crauswell.  (*Id.* at 62.)

In 2005, Bennett resigned from Somerby in order to start his own painting

company.  (Doc. 17-1 at 69, Bennett Depo; Doc. 17-4 at 117, Crauswell Depo.)  After

Bennett's resignation, Crauswell hired Bennett to paint at Somerby on a contract basis.

(Doc. 17-1 at 70, Bennett Depo.)  In July 2007, Bennett began working in the

maintenance department at Chateau Vestavia, another retirement home.  (*Id.* at 76, 93.)

At Chateau Vestavia, Bennett worked with one other maintenance technician, performing

primarily preventive maintenance tasks.  (*Id.* at 76-77.)

      While working at Chateau Vestavia, Bennett was contacted by Crauswell, who

asked him if he would be interested in working at Brookdale (formerly Somerby) again.

(*Id.* at 78.)  Bennett accepted the position and resigned from Chateau Vestavia.  (*Id.* at 79-

81; Doc. 17-3 at 75, Resignation Letter.)  Bennett completed an application for

employment with Brookdale on April 6, 2008.  (Doc. 17-2 at 2, App. for Employment.)

On the application, Bennett checked a box indicating that he was able to perform the

essential functions of the Maintenance Technician position with or without reasonable

accommodation.  (*Id.*)  In April 2008, Bennett had a pre-employment, post-offer physical

exam at St. Vincent's Hospital.  (Doc. 17-1 at 95-96, Bennett Depo.)  In the examination

report, the examining physician checked a box indicating that there were no findings

suggesting a need for limitations.  (*Id.* at 96; Doc. 17-2 at 9, Physical Examination

Report).

      On April 22, 2008, Bennett signed two forms in which he acknowledged receiving

a copy of the Associate Handbook.  (Doc. 17-1 at 227-29, Bennett Depo.; Doc. 17-2 at 21;

Doc. 17-3 at 61).  Bennett began working for Brookdale on April 23, 2008.  (Doc. 17-1 at

93-94, Bennett Depo.)  On April 24, 2008, Bennett attended an Orientation session at

Brookdale, where he received instruction on, among other things, Brookdale's policies and procedures. (Doc. 17-1 at 229-30, Bennett Depo.; Doc. 17-3 at 63.)

As when Bennett worked at Somerby, Crauswell was Bennett's direct supervisor when Bennett returned to the University Park facility. (Doc. 17-4 at 107-08, Crauswell Depo.) In conversations with Crauswell prior to beginning work at Brookdale, Bennett asked Crauswell about work arrangements and whether he could work alone. (Doc. 17-1 at 81, Bennett Depo.) Bennett claims that Crauswell assured him that "everything would be like it was [when Bennett worked for Somerby] because you've always done your best work working by yourself." (*Id.*)

In his position as Maintenance Technician, just as in his previous position with Somerby, Bennett was mainly responsible for painting, and, if on call on weekends, for performing general maintenance and repair tasks as well. (Doc. 17-1 at 102, 111, Bennett Depo.) Bennett worked with three other Maintenance Technicians: Jammie Pounders, Tommy McAlpine, and Bill Perkins. (*Id.* at 104.) Pounders and Perkins typically performed maintenance tasks, while Bennett and McAlpine primarily did painting, repairing, and patching walls, although each employee was expected to perform general maintenance tasks. (*Id.* at 104-08.) McAlpine was the lead painter. (*Id.* at 105-06.) Among their other duties, Bennett and McAlpine painted hallways and stairways and were responsible for repainting apartments when residents moved out. (*Id.* at 106-07). Bennett and McAlpine worked together when painting hallways and, when painting apartments,

7

worked in the same room the "[m]ajority of the time." (*Id.* at 140.)  Because Brookdale often has little prior notice of apartment vacancies due to residents' hospitalizations or deaths, and because apartments need to be quickly turned around for the incoming residents, maintenance employees often must work together to complete jobs in a short amount of time.  (Doc. 17-8 ¶ 5, Crauswell Decl.; Doc. 17-9 ¶ 18, Barber Decl.)

**Medical Conditions**

### a. Thyroid condition and cancer

Bennett has a thyroid condition for which he has taken medication since 2005 or 2006.  (Doc. 17-1 at 120-21, Bennett Depo.)  At least once during his employment at Brookdale, Bennett contacted Crauswell to tell him that he would not be able to come to work because of a reaction he was having to his medication.  (*Id.* at 200; Doc. 17-4 at 155, 185, Crauswell Depo.)  Bennett claims never to have discussed his thyroid condition or thyroid medication with Crauswell or anyone else at Brookdale.  (Doc. 22-7 ¶ 9, Bennett Decl.)

Bennett was diagnosed with rectal cancer in approximately 2001.  He had rectal surgery in 2001 and 2004, and following a recurrence of the cancer, had radiation and chemotherapy treatment in 2009.  (Doc. 22-10, pp. 23-25, 42-43, 50-51, 64, Medical Records of Dr. Murray and Dr. Coyle; Doc. 17-1 at 66, Bennett Depo.)  As a result of these surgeries, Bennett lost the ability to control his bowels. (Doc. 17-1 at 65-68, Bennett Depo.)

### b. Depression and problems sleeping and concentrating

Bennett has always had trouble concentrating when there are distractions or other people are around.  (Doc. 17-1 at 134, Bennett Depo.)  While he finds distractions "irritating," he testified that he can "work and do my job, whatever is required of me."  (*Id.* at 134, 194.)  It is difficult for Bennett to stay focused on conversations with others, as his mind frequently wanders and he often finds himself having to ask others to repeat what they have just said to him.  (*Id.* at 126, 190.)  Once the statement or instruction is repeated to him, however, he can perform the required task.  (*Id.* at 190.)  Bennett claims he cannot work with "disruptions going on" around him or with somebody talking next to him.  (*Id.* at 116.)  He says he has a very short attention span and gets easily confused, but that "it's better" when he is on medication.  (*Id.* at 131.)

Bennett has suffered from depression since he was about twenty-six years old when he was hospitalized for a suicide attempt, but has not always taken medication for it.  (Doc. 22-7 ¶ 3, Bennett Decl.; Doc. 17-1 at 117-18, Bennett Depo.)  In May or June of 2008, Bennett's doctor, Dr. Jim Holloway, prescribed Celexa to him for depression.  (Doc. 17-1 at 122, Bennett Depo.)  Celexa helped Bennett's feelings of depression, low mood swings, and crying spells, but had little or no positive effect on his ability to concentrate and stay focused.  (Doc. 22-7 ¶ 3, Bennett Decl.)  Bennett took Celexa and other antidepressants until he was referred to Dr. Thomas LeCroy, a psychiatrist with Alabama Psychiatric Services, for more specialized care.  (Doc. 17-1 at 121-24, 127, Bennett Depo.)

Dr. LeCroy has treated Bennett's depression with various medications.  (*Id.* at 124-26, 128-29.)  According to Bennett, Dr. LeCroy changed Bennett's medication to Segeline at one point because of his complaints of forgetfulness and staying focused.  (*Id.* at 126.)

Bennett claims that his depression also affects his ability to sleep.  He has suffered from insomnia for several years and takes medication to treat his insomnia.  (*Id.* at 190-91; Doc. 22-7 ¶ 7, Bennett Decl.)  Bennett "consistently" sleeps for only two to three hours a night, and, as a result, he is tired and lethargic during the day.  (Doc. 22-7 ¶ 7, Bennett Decl.)

In June of 2008, Bennett told Nancy Barber, the Director of Human Resources at Brookdale, that he was on medication for depression and that other family members had suffered from depression.  (Doc. 17-1 at 152-56, Bennett Depo; Doc. 17-5 at 27-28, Barber Depo.)  Bennett told Barber that he did not want to tell Crauswell because Crauswell talks about employees' personal problems and Bennett did not "like people knowing [his] business."  (Doc. 17-1 at 153, 158-59, Bennett Depo.)  Barber asked Bennett if he was asking for anything, and Bennett said that he was not asking for anything; he just wanted Barber to know about it.  (Doc. 17-5 at 25-27, Barber Depo.)  In his deposition, Bennett testified that he does not recall requesting an accommodation from Barber at this or any other time, but that if he had, he thinks he would remember having requested it.  (Doc. 17-1 at 154-55, Bennett Depo.)  Barber documented her conversation with Bennett in a memorandum and discussed the conversation with Eddie Cummings, the

Executive Director of the University Park facility.  (Doc. 17-5 at 12, 22-23, 31, Barber

Depo.; Doc. 17-6.)  Barber never told Crauswell about the conversation she had with

Bennett regarding his treatment for depression.  (Doc. 17-5 at 31.)

Bennett claims that, a few days after his conversation with Barber, he told

Crauswell that he suffered from depression and was taking Celexa to treat it.  (Doc. 17-1

at 162-64, 167, Bennett Depo.)  Bennett claims that Crauswell responded by stating,

"[D]on't be coming in here and going postal on everybody and shooting people."  (*Id.* at

163.)  Bennett also claims that Crauswell stated that he had a relative who took the same

medication and that she was "a nut."  (*Id.* at 164.)  In the same conversation, Bennett told

Crauswell that he had reported his condition to Barber, which made Crauswell angry

because he perceived it as disrespectful to him.  (*Id.* at 166-68.)  Bennett did not tell

Barber about his conversation with Crauswell, thinking "it would blow over and that

would be it."  (*Id.* at 166.)

Bennett never informed Barber or Crauswell that he had a disability, only talking

with them about his antidepressant medications.  (Doc. 17-1 at 189, Bennett Depo.; Doc.

17-8  ¶ 9, Crauswell Decl. )  Bennett never provided medical documentation to Crauswell

regarding his depression.  (Doc. 17-8 ¶ 9, Crauswell Decl.)

**Bennett's Job Performance at Brookdale in 2008**

While employed at Brookdale for the second time, Bennett did not wear the

required uniform for Maintenance Technicians, because, he claims, he never received the

uniforms.  (Doc. 17-1 at 187-88, Bennett Depo.; Doc. 17-4 at 140, 143-44, Crauswell

Depo.)  At times, Bennett would wash his paintbrushes in kitchen sinks in the resident

apartments, instead of using the mop bucket sinks in the hallways that were intended for

cleaning paint tools.  (Doc. 17-1 at 188-89, Bennett Depo.; Doc. 17-4 at 140-41, Crauswell

Depo.)

Crauswell never disciplined Bennett for his performance or for his violation of

work rules.  (Doc. 17-4 at 147, Crauswell Depo.; Doc. 17-1 at 196, Bennett Depo.)

Crauswell did, however, prepare a performance evaluation of Bennett around September

2008, in which he discussed some of the issues he had with Bennett's performance,

including Bennett's absences from work due to illness and his frequent work breaks.

(Doc. 17-4 at 217-24, Crauswell Depo.; Doc. 17-4 at 77, Annual Performance Review.)

Because Crauswell's evaluations of his employees were not due until October 1, 2008,

Crauswell had not yet discussed Bennett's employment evaluation with Bennett when

Bennett's employment at Brookdale ended in late September 2008.  (Doc. 17-4 at 218-19,

Crauswell Depo.)

Bennett claims that he approached Crauswell between four to six times during his

second period of employment at the University Park facility (from April to September

2008) to complain that McAlpine talked too much at work and that Bennett found it

distracting.  (Doc. 17-1 at 142, 145, 148, Bennett Depo.)  He told Crauswell that it was

hard to work with McAlpine, because McAlpine "never shut up," making it difficult for

Bennett to focus on what he was doing  (*Id.* at 141-42.)  Bennett claims that, on each of these occasions, he asked Crauswell to go back to "the old way of doing things," by which he meant that he wanted to work alone like he had at Somerby.  (*Id.* at 85, 141, 144.) Bennett says Crauswell was familiar with Bennett's preference for working alone because Bennett had told Crauswell about it when he worked under Crauswell at Somerby.  (*Id.* at 137-38.)  Bennett claims that Crauswell would always say something like, "We'll work it out," in response to his requests, but Bennett felt like Crauswell was brushing him off. (*Id.* at 145, 149, 171.)  Bennett did not feel free to discuss the subject because Crauswell would tease him about his medications.  Bennett felt that Crauswell belittled him in order to "get [Bennett] out of [Crauswell's] office to shut [Bennett] up or something."  (*Id.* at 150, 170.)

Bennett claims that Crauswell once told Bennett that he could not do special favors for Bennett because if he did them for Bennett, he would have to do them for everyone. (*Id.* at 146, 149-50.)  Crauswell testified that he does not have authority to allow a painter to paint in a room by himself, and if he had received such a request, he would have gone to Human Resources for advice about what to do.  (Doc. 17-4 at 191, Crauswell Depo.)

**Bennett's Last Day of Employment at Brookdale**

On the morning of September 26, 2008, Bennett had been working with McAlpine in a resident's apartment when he decided to go speak to Crauswell.  (Doc. 17-1 at 175-77, Bennett Depo.; Doc. 17-4 at 164-65, Crauswell Depo.)  He claims he went to Crauswell's

office and started the conversation by saying to Crauswell, "[H]ave you thought about the work arrangements?" and that before Bennett could say anything else, Crauswell "just jumped up and went ballistic" on him.  (Doc. 17-1 at 178, Bennett Depo.)  Bennett claims that Crauswell began to raise his voice and shout at him, saying, "I can see you're not happy here.  You're wanting certain accommodations.  I can't give you certain accommodations.  I think it's time you go.  You need to go and get your mental problems taken care of."  (*Id.* at 178-79.)

Bennett left his keys and radio on Crauswell's desk and went upstairs to gather his personal belongings.  (*Id.* at 179-80.)  Bennett went to see Nancy Barber, but her door was closed so he did not attempt to speak with her.  (*Id.* at 180.)  Bennett did not attempt to see Cummings, Brookdale's Executive Director, because Bennett believed Cummings was friends with Crauswell and assumed that seeing Cummings would be "useless."  (*Id.*)

Immediately after Bennett left Crauswell's office, Crauswell drafted an e-mail to Barber, wherein he stated,

> I need to inform you that Johnny Bennett resigned this morning because he could not work with others at this time.  John has missed several days due to nerves problems and just not being able to cope with day to day things.  He was going to work out a notice but because of the issue I told him he did not have to do that for me, so he decided to go ahead and leave today.

(Doc. 17-4 at 164-65, 168, Crauswell's Depo.; Doc.17-4 at 71, E-mail to Nancy Barber.)

After leaving Crauswell's office, Bennett returned to the apartment where he had been working and told Jammie Pounders, "[I]t was a pleasure knowing you. It's a pleasure

working with you. Take care of yourself."  Bennett then told McAlpine to "go fuck yourself" and left the room.  (Doc. 17-1 at 180-81, Bennett Depo.)

Bennett never complained to Barber or Cummings about perceived discrimination and never called the company's Integrity hotline to complain about discrimination.  (Doc. 17-1 at 206-07, Bennett Depo.)

**Post-Employment at Brookdale**

On September 29, 2008, the day after his alleged termination, Bennett filed a charge with the Equal Employment Opportunity Commission ("EEOC"), claiming Brookdale discriminated against him because of his disability, chronic depression.  (Doc. 17-2 at 19, EEOC Charge; Doc. 17-2 at 17, EEOC Intake Questionnaire.)  In his EEOC Charge, Bennett asserted, "On September 26, 2008, I was denied the reasonable accommodation of being allowed to perform my assigned work duties alone and was discharged . . . I was informed [by my supervisor] I was being discharged because my supervisor could see I was not happy working there."  (Doc. 17-2 at 19, EEOC Charge.)  The EEOC dismissed Bennett's claim, stating it was unable to find a statutory violation.  (Doc. 17-2 at 20, EEOC Dismissal and Notice of Rights.)

Brookdale maintains that Bennett resigned on September 26, 2008.  (Doc. 17-4 at 174, Crauswell Depo.; Doc. 17-8 ¶ 10, Crauswell Decl.; Doc. 17-5 at 50, Barber Depo.)  Brookdale paid Bennett his accrued paid time off ("PTO"), consistent with its policy for employees who resign. (Doc. 17-1 at 182, Bennett Depo.; Doc. 17-5 at 41, Barber Depo.;

Doc. 17-6 at 2-5; Doc. 17-9 ¶ 17, Barber Decl.)  Brookdale does not pay PTO to employees who are terminated.  (Doc. 17-9 ¶ 17, Barber Decl.)

On October 1, 2008, Bennett applied for unemployment compensation benefits with the Alabama Department of Industrial Relations.  (Doc. 17-1 at 242, Bennett Depo.; Doc. 22-1 at 7, Ala. Dept. Indus. Relations Records.)  Brookdale asserted to the Alabama Department of Industrial Relations that Bennett had resigned his employment at Brookdale and was not terminated.  (Doc. 17-5 at 41, 43, Barber Depo.; Doc. 17-6 at 2-5, E-Mail to ADP Unemployment Group; Doc. 22-1 at 31.)  The Department of Industrial Relations found that Bennett was eligible for employment benefits beginning on September 28, 2008.  (Doc. 22-1 at 1, Ala. Dept. Indus. Relations Records.)

## III.  DISCUSSION

### A.  ADA Termination Claim

Bennett claims that he was wrongfully terminated on the basis of his alleged disability, depression.  The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Under the ADA, "disability" is defined as (1) "a physical or mental impairment that substantially limits one or more major life activities of such individual," (2) "a record of such an impairment," or (3) "being regarding as having such an impairment."  42 U.S.C. § 12102(1).

16

An ADA plaintiff may prove a claim for discriminatory discharge by presenting direct evidence of discrimination or through the use of circumstantial evidence. *Wilson v. Gayfers Montgomery Fair Co.*, 953 F. Supp. 1415, 1420 (M.D. Ala. 1996) (citations omitted); *see Haynes v. W.C. Caye Co., Inc.*, 52 F.3d 928, 931 (11th Cir. 1995). Direct evidence is "that evidence which, if believed, 'establishes discriminatory intent without inference or presumption.'" *Gayfers*, 953 F. Supp. at 1421 n.10 (citing *Clark v. Coats & Clark*, 990 F.2d 1217, 1226 (11th Cir. 1993)); *see also Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189-90 (11th Cir. 1997) (listing cases where the Eleventh Circuit has found direct evidence of race and sex discrimination in employment and quoting the statements found to amount to direct evidence). For example, in an ADA case, a decisionmaker's blanket statement that people with a certain disability are not competent to perform a particular job would amount to direct evidence of discrimination. *Cf. Haynes v. W.C. Caye & Co., Inc.*, 52 F.3d 928, 931 (11th Cir. 1995) ("[A] statement that members of a racial minority in general or women in general are simply not competent enough to do a particular job would seem to be a classic example of direct evidence [of discriminatory intent]."). Motive or intent is seldom capable of proof by direct evidence. *Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1141 (11th Cir. 1983). "Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence." *Merritt*, 120 F.3d at 1189 (citations omitted).

The plaintiff in a direct evidence case "must produce direct testimony that the employer acted with discriminatory motive, and must convince the trier of fact to accept the testimony." *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990). "If the plaintiff produces such evidence and the trier of fact believes it, the defendant must prove by a preponderance of the evidence that the defendant would have reached the same decision without the factor proved." *Id.*

Bennett contends that direct evidence of discrimination can be found in Crauswell's oral and written statements.  In his deposition, Bennett claims that when he spoke with Crauswell about his work arrangements on the morning of September 26, 2008, Crauswell responded by saying,

> John, I can see you're not happy working here. . . You're wanting certain accommodations.  I can't give you certain accommodations.  I think it's time you go.  You need to go and get your mental problems taken care of. . . You're causing too much disruption in my department, you've got to go.  I can't have this in my department.

(Doc. 17-1 at 178-79, Bennett Depo.)  Bennett also points to the email sent by Crauswell to Nancy Barber immediately after Bennett came to Crauswell's office that same day, in which Crauswell states, "John has missed several days due to nerves problems and just not being able to cope with day to day things."  (Doc. 17-4 at 71.)  Bennett claims these statements reveal direct evidence of Crauswell's discriminatory animus to fire Bennett on the basis of his disability.  (Doc. 21 at 18-19.)

Brookdale argues that Crauswell's statements cannot be construed as direct evidence of discrimination because Crauswell did not have decisionmaking authority at Brookdale with regard to the hiring and firing of employees.  (Doc. 23 at 4.)  The Eleventh Circuit Court of Appeals has held that remarks "by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination." *Bass v. Board of County Comm'rs, Orange County, Fla.*, 256 F.3d 1095, 1105 (11th Cir. 2001) (citation omitted) (*overruled in part on other grounds* by *Crawford v. Carroll*, 529 F.3d 961, 971 (11th Cir. 2008)).  "For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged decision."  *Id.* (citation omitted).  Brookdale contends that, because Bennett acknowledged receiving a copy of Brookdale's Associate Handbook, which discusses termination policies, Bennett "should have been aware that terminations require upper-level supervisory approval and review by the human resources department."  (Doc. 23 at 4.)  The court disagrees.  While Crauswell does not have independent authority under Brookdale's policies to terminate employees, he testified that he does have authority to at least initiate the process by which an employee can be terminated.  (Doc. 17-4 at 235-36, Crauswell Depo.)  Crauswell is the one who allegedly fired Bennett, and therefore was directly "involved in the challenged [employment] decision."  *Bass*, 256 F.3d at 1105.  Also, the ADA includes in the definition of "employer" the employer's agents, which arguably would include Crauswell.  42 U.S.C. § 12111(5)(A).  Viewing the evidence in the

19

light most favorable to Bennett, this court finds that Bennett may have reasonably perceived Crauswell to be a decisionmaker and that Crauswell did have at least some degree of decisionmaking authority.  Therefore, the court rejects defendant's argument that the court should find no direct evidence of discrimination on the basis that Crauswell did not have decisionmaking authority.

For other reasons, however, the court fails to find direct evidence of discrimination in the record.  While Crauswell's statements may *suggest* that Crauswell discriminated against Bennett or that Crauswell was impatient or inconsiderate with regard to Bennett's alleged disability, they are not blatant enough to rise to the level of direct evidence of discrimination.  *Merritt*, 120 F.3d at 1190 (evidence only suggestive of discrimination does not constitute direct evidence); *see also Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1359 (11th Cir. 1999) (citation omitted) (noting that an example of direct evidence of age discrimination would be a management memorandum stating, "Fire [plaintiff]- he is too old.").  In *Wascura v. City of South Miami*, the Eleventh Circuit failed to find direct evidence of discrimination under the ADA where the plaintiff's supervisor told her, "Things aren't right. I don't want you here. I want you to resign. And if you need an excuse, you can use what's going on at home."  257 F.3d 1238, 1242 n.2 (11th Cir. 2001).  The court stated that these statements were "at most weak circumstantial evidence of discrimination."  *Id.*

Although stronger than the statements discussed in *Wascura*, Crauswell's statements to Bennett and to Barber are not direct evidence of discrimination as they do not establish discriminatory intent "without inference or presumption." *Gayfers*, 953 F. Supp. at 1421 n.10 (citations omitted).  A rational trier of fact could conclude that Crauswell's reference to "certain accommodations" refers to Bennett's need to arrive late to work because he needs to drop his children off at school beforehand or needs to take his wife to work.  Though it is a reasonable inference from Bennett's testimony that Crauswell was referring to accommodations for Bennett's alleged disability or "mental problems," it is an inference nonetheless.  Moreover, according to Bennett's testimony, Crauswell stated that Bennett was "causing too much disruption in my department."  To reach the conclusion that Bennett's "mental problems" were the "disruption" or were causing the "disruption" requires an inference.  Without more, a rational jury could reasonably conclude that the "disruption" was completely unrelated to Bennett's alleged disability.  For instance, the "disruption" could refer to the constant ringing of Bennett's cell phone or repeated emotional outbursts in response to breaking news on the Internet.[3]  In the absence of an inference linking Bennett's alleged disability to the "disruption" for which Crauswell told Bennett that he has "got to go," a rational jury could not reasonably find

---

[3]  To be clear, there is no evidence in the record that Bennett arrived at work late to take his wife to work or to drop his children off at school, that his cell phone frequently rang, or that he was prone to have dramatic reactions to breaking news.  These illustrations are offered solely to show that the "disruption" and "accommodations" referenced by Crauswell could have been unrelated to Bennett's alleged disability.

21

discriminatory intent based solely on Crauswell's oral statement.  Crauswell's email to Nancy Barber, in which he writes that Bennett resigned "because he could not work with others" and that he has "missed several days due to nerves problems" is also not direct evidence of discrimination.  Although the reference to Bennett's "nerves problems" could be interpreted to refer to Bennett's disability, the email does not contain evidence of a discriminatory attitude with regard to Bennett's nerves problems.

The court's decision that Crauswell's statements do not amount to direct evidence would be different if, for example, Crauswell had told Bennett, "I can't give you certain accommodations for your mental problems," or "Your mental problems are causing too much disruption in my department, therefore you need to go."  Alternatively, if Crauswell had said, "People with mental problems can't do anything right," that would be direct evidence of discrimination.  *See, e.g., Alton Packaging Corp.*, 901 F.2d at 922-24 (production manager's statements to black employee that "you people can't do a ---- thing right" constituted direct evidence); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 874-76 (11th Cir. 1985) (statement by plant manager that he wouldn't hire blacks because "[h]alf of them weren't worth a shit" was direct evidence).  Unlike these illustrations, Crauswell's statement to Bennett does not clearly establish discriminatory intent without an inference.  Rather, Crauswell's statements are more appropriately deemed circumstantial or indirect evidence, and, as such, may properly be used by Bennett under a burden-shifting analysis of proof.

22

## 1. Prima Facie Case

The Eleventh Circuit has held that the burden-shifting framework established in the context of Title VII employment discrimination claims by the Supreme Court in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), is applicable to ADA termination claims. *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007). Once the plaintiff has proven a prima facie case, the burden shifts to the defendant to articulate one or more legitimate, nondiscriminatory reasons for its employment action. *See Burdine*, 450 U.S. at 253. "'[T]o satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus.'" *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (quoting *Burdine*, 450 U.S. at 257). If the defendant accomplishes this, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the defendant's alleged reason or reasons were a pretext for unlawful discrimination. *See Burdine*, 450 U.S. at 253.

The employee bears the burden of establishing a prima facie case of disability discrimination by a preponderance of the evidence. *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000); *Reed v. Heil Co.,* 206 F.3d 1055, 1063 (11th Cir. 2000). To meet this burden, Bennett must prove (1) he has a disability (real or perceived); (2) he is otherwise qualified to perform the essential functions of the job; and (3) he was

subjected to unlawful discrimination because of his disability (real or perceived).  *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1290 (11th Cir. 2002); *Davis*, 205 F.3d at 1305. Brookdale disputes the first and third prima facie elements, arguing that Bennett is not disabled and did not suffer an adverse employment action. Viewing the facts in the light most favorable to Bennett, the court will assume that Bennett was terminated, and will therefore focus the analysis on evidence of disability.

**a.  Disability**

Brookdale first argues that Bennett cannot establish that he is disabled within the meaning of the ADA.  (Doc. 16 at 22.)  Under the ADA, a plaintiff is disabled if he (1) has a physical or mental impairment that substantially limits one or more of the [plaintiff's] major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment.  42 U.S.C. § 12102(1).  Bennett argues that he is disabled under any of the three definitions.

1. Actual Disability

Disability under the first definition requires a three-step analysis.  *Rossbach v. City of Miami*, 371 F.3d 1354, 1357 (11th Cir. 2004) (citing *Bragdon v. Abbott*, 524 U.S. 624 (1998)).  First, the plaintiff must be impaired.  *Id.*  Second, "the court must identify the life activity that the plaintiff claims has been limited and determine whether it is a major life activity under the ADA."  *Id.*  "Finally, the court must determine whether the impairment 'substantially limits' that life activity."  *Id.*  The determination of whether an individual

has a disability is not necessarily based on the name or diagnosis of the impairment, but rather on the effect of that impairment on the life of the individual.  *Pritchard v. Southern Company Servs.*, 92 F.3d 1130, 1132 n.3 (11th Cir. 1996) (quoting 29 C.F.R. § 1630.2(j)(App.)).  The Supreme Court has held that the term "disability" is to be "interpreted strictly to create a demanding standard for qualifying as disabled." *Carruthers v. BSA Advertising, Inc.*, 357 F.3d 1213, 1216 (11th Cir. 2004) (quoting *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002), *superseded by* ADAAA, Pub. L. No. 110-325, 122 Stat. 3353 (2008)).[4]

Courts look to the ADA's implementing regulations to determine the functions that qualify as major life activities.  *Littleton v. Wal-Mart Stores, Inc.*, 231 Fed. Appx. 874,

---

[4] The ADA Amendments Act of 2008 ("the ADAAA"), Pub. L. No. 110-325, 122 Stat. 3353, became effective on January 1, 2009. The ADAAA specifically rejects as inappropriately narrow and restrictive the disability standards articulated by the U.S. Supreme Court in *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), and *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999). All of the conduct alleged in the Complaint occurred before the ADAAA became effective. Plaintiff has not argued that the ADAAA applies to his claims, and the majority of courts addressing the issue have held that the ADAAA is not retroactive. *See, e.g., E.E.O.C. v. Agro Distrib., LLC*, 555 F.3d 462, 469 n.8 (5th Cir. 2009); *Kiesewetter v. Caterpillar Inc.*, 295 Fed. Appx. 850, 851 (7th Cir. 2008); *Verhoff v. Time Warner Cable, Inc.*, 299 Fed. Appx. 488, 494 (6th Cir. 2008); *Geoghan v. Long Island R.R.*, No. 06-CV-1435, 2009 WL 982451, at *8-9 (E.D.N.Y. Apr. 9, 2009) (Pollak, M.J.). While the Eleventh Circuit Court of Appeals has not addressed the issue in a published opinion, the court's ruling in an unpublished decision suggests that the ADAAA does not apply retroactively. *Fikes v. Wal-Mart, Inc.*, 322 Fed. Appx. 882, 883 n.1 (11th Cir. 2009) ("Plaintiff makes no argument that the amendments should apply retroactively; and absent Congressional expression to the contrary, a presumption against retroactive application applies when the new legislation would 'impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'").  Therefore, like the *Fikes* court, "[W]e look to the ADA as it was in effect at the time of the alleged discrimination." *Id.*

876, 2007 WL 1379986 (11th Cir. May 11, 2007).  A major life activity is a basic activity that an average person in the general population can perform with little or no difficulty, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.  29 C.F.R. § 1630.2(i)(App.).

Bennett claims that he is substantially impaired by his depression in the major life activities of sleeping, thinking, concentrating, and interacting with others.  The Eleventh Circuit has recognized depression as a qualifying mental impairment under the ADA. *Pritchard*, 92 F.3d at 1132 (citation omitted).  An impairment substantially limits a major life activity if the plaintiff is "significantly restricted as to the condition, manner or duration under which the average person in the general population can perform the same major life activity." *Rossbach*, 371 F.3d at 1357 (quoting 29 C.F.R. § 1630.2(j)(1)). Factors to consider in determining whether an impairment "substantially limits" a major life activity are (i) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment, and (iii) the permanent or long term impact of the impairment. 29 C.F.R. § 1630.2(j)(2).  The restriction on the major life activity must be a result of the impairment.  *Id.* at § 1630.2(j)(App.).  The effects of mitigating measures, both positive and negative, "must be taken into account when judging whether [a] person is 'substantially limited' in a major life activity and thus 'disabled' under the Act." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482 (1999),  *superseded by* ADAAA, Pub. L. No. 110-325, 122 Stat. 3353 (2008)).

Brookdale first argues that Bennett has not shown that he is substantially limited in the major life activity of sleeping.  (Doc. 23 at 5.)  The Eleventh Circuit has held that sleeping qualifies as a major life activity under the ADA.  *Nadler v. Harvey*, 2007 WL 2404705 (11th Cir. Aug. 24, 2007).[5]  Because "[d]ifficulty sleeping is extremely widespread," a plaintiff must present evidence "beyond vague assertions of 'a rough night's sleep' or a need for medication, 'that his affliction is [ ] worse than [that] suffered by [a] large portion of the nation's adult population.'"  *Id.* at *6 (quoting *Rossbach*, 371 F.3d at 1358).

Brookdale argues that Bennett's deposition testimony that he "can do whatever is required" of him at work and that he can "function normally" with his antidepressant medication reveals that his lack of sleep has not had a severe impact on his life.  (Doc. 17-1 at 134, 194, Bennett Depo.)  Bennett claims that he "consistently sleep[s] no more than 2-3 [hours] a night," and that occasionally he can fall back asleep after waking up, but that "more often than not, that is all the sleep [he gets] in a night."  He says that, as a result of his lack of sleep, he is tired and lethargic during the day and that his productivity has been affected.  (Doc. 22-7 ¶ 7, Bennett Decl.)  Bennett has suffered from insomnia since 2004

---

[5] Although *Nadler* is a Rehabilitation Act case, the standard for analyzing Rehabilitation Act disability employment discrimination claims is the same as that for ADA disability discrimination claims.  *See Allmond v. Akal Sec., Inc.*, 558 F.3d 1312, 1316 n.3 (11th Cir. 1999) (noting that the "same standards govern discrimination claims under the Rehabilitation Act and the ADA" and cases interpreting the statutes can be used "interchangeably"); *Gordon v. E.L. Hamm & Assoc., Inc.*, 100 F.3d 907, 911 (11th Cir. 1996) (noting that the ADA regulations adopt the definition of "major life activities" found in the Rehabilitation Act regulations).

or 2005, and he takes medication for insomnia but says he still "[doesn't] sleep that well." (Doc. 17-1 at 190-92, Bennett Depo.)  The only reference to a difficulty sleeping in Bennett's medical records from the relevant time period of April to September 2008 is a note from Dr. Holloway's June 2008 exam, when Bennett reported that he was "not sleeping well," among other problems.  (Doc. 22-8 p. 8, Medical Records of Dr. John Holloway.)

The Eleventh Circuit has rejected claims of substantial limitations on sleeping where the plaintiff is able to function adequately during the day or has not shown that getting less than a full night of sleep affects him differently than others.  *See, e.g.*, *Nadler v. Harvey*, 2007 WL 2404705, at *6, *2 (11th Cir. Aug. 24, 2007) (plaintiff who slept between four and seven and a half hours a night when medicated was not substantially limited by his depression in the major life activity of sleeping); *Roberts v. Rayonier, Inc.*, 326 F. Supp. 2d 1323 (M.D. Fla. 2004), *aff'd in part, vacated on other grounds*, 135 Fed. Appx. 351 (11th Cir. 2005) (affirming district court's grant of summary judgment as to court's finding plaintiff was not disabled).  In *Roberts*, the plaintiff claimed that his depression and alcoholism caused "major limitations on his ability to socialize, and his sleeping patterns," among other symptoms.  326 F. Supp. 2d at 1331.  The district court wrote that its conclusion that plaintiff was not substantially limited in any major life activity was "buttressed by the fact that Plaintiff was able to work without incident for over a year following the signing of the last chance agreement."  *Id.*  The court agrees with

28

Brookdale that Bennett's assertion of sleeping only two to three hours a night, unsupported by further medical documentation or affidavits, is not sufficient evidence to support his claim that his sleeping is substantially limited when he has provided no evidence that it has negatively affected his ability to function.

Several other circuits have found that a plaintiff who sleeps two or three hours a night is not substantially impaired in the major life activity of sleeping, particularly where no other evidence was presented that the plaintiff had trouble functioning at work due to a lack of sleep. *See Burks v. Wisconsin Dept. of Transp.*, 464 F.3d 744, 757 (7th Cir. 2006) (difficulty sleeping for more than three hours is not substantial when plaintiff presented no medical records or other evidence to demonstrate the effect of this situation on her ability to function in daily life); *Nuzum v. Ozark Auto. Distrib., Inc.*, 432 F.3d 839, 848 (8th Cir. 2005) (plaintiff who slept two and a half hours at a time and a total of only four to five hours a night was not substantially impaired in major life activity of sleeping); *Simpson v. Vanderbilt Univ.*, 359 Fed. Appx. 562, 567 (6th Cir. 2009) (sleeping three or fewer hours a night for five nights out of the week is not substantially limited; plaintiff's uncorroborated testimony about his sleep habits held insufficient to raise a genuine issue of material fact); *Pack v. KMart Corp.*, 166 F.3d 1300, 1306 (10th Cir. 1999) (plaintiff who claimed to "sometimes" get only two to three hours of sleep a night was not substantially limited with regard to sleeping where there was no indication that her sleep problems were severe, long term, or had a permanent impact, and were generally controlled by medication); *but see*

*Desmond v. Mukasey*, 530 F.3d 944 (D.C. Cir. 2008) (holding that genuine issues of fact existed as to whether plaintiff who slept two to three hours a night was substantially limited as to his sleeping; court noted that a plaintiff's own testimony is adequate to raise an issue of fact and that a plaintiff is not required to show that his lack of sleep affects his work performance or otherwise has an "ancillary effect on his waking life"); *Head v. Glacier Northwest*, 413 F.3d 1053 (9th Cir. 2005) (plaintiff's sleeping five to six hours a night held enough to create a genuine issue of material fact as to a substantial limitation on sleep when the plaintiff testified that he was drowsy at work due to medication and a lack of sleep).

Brookdale next argues that Bennett has not shown that he is substantially limited in the major life activity of thinking or concentrating. (Doc. 23 at 6.) In a declaration and in deposition testimony, Bennett says that it is extremely difficult for him to stay focused in conversations and that he frequently has to stop and ask others to repeat their questions to him. He says that he frequently has to ask those giving him instructions to repeat the instructions two to three times before he comprehends what they are asking. (Doc. 22-7 ¶¶ 5-6, Bennett Decl.; Doc. 17-1 at 116, 130-31, 134, Bennett Depo.) Bennett testified in his deposition that he takes medication for his attention problems, which helps him to concentrate. (Doc. 17-1 at 131, Bennett Depo.)

Thinking and concentrating are included in the nonexhaustive list of major life activities set out in the ADA. 42 U.S.C. § 12102(2)(A); 29 C.F.R. § 1630.2(i). The

Eleventh Circuit has not yet held whether interacting with others qualifies as a major life activity under the ADA.  Assuming it does qualify, the court finds that Bennett has not produced sufficient evidence to establish that he is substantially limited with respect to thinking, concentrating, or interacting with others.  The fact that Bennett needs questions and instructions repeated to him two or three times before he can understand them does not rise to the level of a substantial limitation on his thinking or concentrating.  *Cf. Head*, 413 F.3d at 1061 (plaintiff alleged sufficient evidence to demonstrate a substantial impairment in the major life activity of thinking where plaintiff claimed an inability to stay focused for more than brief periods, a need to be repeatedly reminded of appointments and tasks, and that "things just got jumbled up in [his] mind" if he looked at written material for too long); *Cambria v. Assoc. of Flight Attendants, AFL-CIO*, 2005 WL 1563343 (E.D. Pa. June 30, 2005) (holding that a reasonable jury could conclude that plaintiff's depression substantially limited her ability to think where she suffered from suicidal thoughts, ate pesticide, attempted suicide, and testified that she felt like a "zombie" and "could not function" at times); *Norman v. Southern Guar. Ins. Co.*, 191 F. Supp. 2d 1321, 1334-35 (M.D. Ala. 2002) (finding a genuine issue of material fact as to whether plaintiff's depression substantially limited her ability to think where she alleged an inability to concentrate, think straight or sit still, among other symptoms).  Also, because Bennett's attention problems can be alleviated with medication, his thinking and concentrating are not substantially limited.  *Blackston v. Warner-Lambert Co.*, 2000 WL 122109, at *4

31

(N.D. Ala. Jan. 26, 2000) ("Blackston's testimony at his deposition that 'as long as I'm on my medication, it's okay' belies any argument that he was substantially limited by his ADD.").

Finally, to the extent that Bennett claims that he is substantially limited in the major life activity of interacting with others, the court finds that Bennett has not offered sufficient evidence to support this claim. The fact that Bennett needed others to repeat their statements and instructions to him does not indicate that he was substantially limited in interacting with others. The Second Circuit Court of Appeals has instructed that

> a plaintiff is 'substantially limited' in 'interacting with others' when the mental or physical impairment severely limits the fundamental ability to communicate with others. This standard is satisfied when the impairment severely limits the plaintiff's ability to connect with others, *i.e.*, to initiate contact with other people and respond to them, or to go among other people-at the most basic level of these activities. The standard is not satisfied by a plaintiff whose basic ability to communicate with others is not substantially limited but whose communication is inappropriate, ineffective or unsuccessful.

*Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 203 (2d Cir. 2004). Courts have found a substantial limitation in interacting with others where a plaintiff cannot handle being around other people to the point that the plaintiff experiences hostility, withdrawal, or an inability to communicate with others. *See Head*, 413 F.3d at 1060-61 (holding that plaintiff's claims of avoiding crowds, stores, family gatherings and doctor's appointments and of refusing to leave the house or answer the telephone demonstrate a substantial impairment in the major life activity of interacting with others); *Cambria*, 2005 WL

1563343 at *11 (holding that a reasonable jury could conclude that plaintiff was

significantly restricted in her ability to interact with others where she testified that she

would "lose it" while waiting in long lines at the store, had "trouble with the law," and

commonly made mistakes in her personal and romantic life); *cf. Littleton*, 231 Fed. Appx.

at 877 (holding that, while it is "unclear" whether thinking, communicating and social

activities are major life activities under the ADA, plaintiff was not substantially impaired

in these activities where she was capable of being interviewed for a job without

accommodation, was "very verbal," and did not need a job coach to communicate

effectively with others in the workforce).  Bennett has not put forth any evidence that rises

to the level of a substantial limitation on his ability to interact with others.

    For these reasons, the court finds that Bennett has not alleged sufficient evidence to

demonstrate the existence of an actual physical or mental impairment as defined by the

ADA.

    2. Record of impairment

    In his Complaint, Bennett argues that Brookdale discriminated against him

"because he has a record of having a physical or mental impairment that substantially

limited one or more major life activities."  (Doc. 1 at 4 ¶ 24.)  Bennett did not develop this

line of argument either in his Response to Defendant's Motion for Summary Judgment,

(Doc. 21), or at oral argument.  A plaintiff who has a record of an impairment has "a

history of, or has been misclassified as having, a mental or physical impairment that

substantially limits one or more major life activities." *Hilburn v. Murata Electronics of North America, Inc.*, 181 F.3d 1220, 1229 (11th Cir. 1999) (quoting 29 C.F.R. § 1630.2(k) (1997)). "This part of the definition of disability is satisfied if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment . . . There are many types of records that could potentially contain this information, including but not limited to, education, medical or employment records." *Id.* (citing 29 C.F.R. pt. 1630, App. § 1630.2(k) (1997)).

Brookdale contends that Bennett did not have a record of an impairment because, as Bennett admits, he never presented medical documentation to anyone at Brookdale regarding his disability, did not indicate a need for limitations on his pre-employment screening, and his working conditions stayed the same throughout his employment, although Crauswell began to watch him more closely. (*See* Doc. 17-8 ¶ 9, Crauswell Decl.; Doc. 17-2 at 2, App. for Employment; Doc. 17-1 at 204-05, Bennett Depo.) The court agrees with Brookdale that there is no evidence in the record to demonstrate that Bennett had a record of an impairment that substantially limited one or more life activities. The "record of" impairment standard is satisfied only if the plaintiff actually suffered from an impairment that substantially limited one or more major life activities. *Hilburn*, 181 F.3d at 1229. Because the court has already found that Bennett did not suffer from an actual disabling impairment, and because Bennett never presented any type of records that Brookdale could have relied on in determining that Bennett had a substantially limiting

34

impairment, Bennett has not met his burden of providing evidence to demonstrate that he qualifies as disabled under the "record of" definition.

3. Regarded as Disabled

Brookdale also contends that Bennett has not provided sufficient evidence to show that Brookdale regarded Bennett as disabled on the basis of his alleged disability, depression. (Doc. 16 at 25-27.) Under the "regarded as" prong, a plaintiff is disabled if his employer perceives him as having an ADA-qualifying disability, even if there is no factual basis for that perception. *Carruthers*, 357 F.3d at 1216 (citations omitted). As with actual impairments, however, the perceived impairment must be one that, if real, would substantially limit a major life activity of the individual. *Id.* (citations omitted). In order "for a plaintiff to prevail under this theory, he must show two things: (1) that the perceived disability involves a major life activity; and (2) that the perceived disability is 'substantially limiting' and significant." *Rossbach*, 371 F.3d at 1360 (citing *Sutton v. Lader*, 185 F.3d 1203, 1209 (11th Cir. 1999)) (holding that police officers were regarded by the City as disabled with respect to the major life activity of working where the City placed the officers on light or limited duty, a title specifically reserved for disabled officers). Bennett argues that, even if he does not have an actual physical or mental impairment that qualifies as a disability under the ADA or a record of such disability, he nonetheless qualifies as disabled because he was regarded as disabled by Brookdale. (Doc. 21 at 27-28.)

The "regarded as" prong of the ADA intends to combat discriminatory conduct based on society's "myths, fears and stereotypes" about disabilities. *See Sutton*, 527 U.S. at 489-90 (citing 29 C.F.R. pt. 1630, App § 1630.2(*l*)).  Therefore, if a plaintiff "can show that an employer . . . made an employment decision because of a perception of disability based on 'myth, fear or stereotype,' the individual will satisfy the 'regarded as' part of the definition of disability." 29 C.F.R. pt. 1630, App § 1630.2(*l*).

Brookdale cites *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 912-13 (11th Cir. 1996), for the proposition that in order for Bennett to prove that Brookdale regarded him as disabled, he must show that Brookdale regarded him as having an impairment that generally forecloses the type of employment involved.  (Doc. 16 at 26-27.) However, this standard only applies when the plaintiff claims that the employer regarded the plaintiff as disabled with regard to the major life activity of working, which Bennett does not allege. *See Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 192 (5th Cir. 1996); 29 C.F.R. § 1630.2(j)(3)(i).  Rather, Bennett argues that Crauswell's attitude towards him reveals that Crauswell regarded him as disabled, presumably with respect to the major life activity of thinking, and that Crauswell stereotyped him based on his disability.  (Doc. 21 at 27.)  Bennett claims that when he told Crauswell that he suffered from depression and took Celexa, Crauswell responded by saying that a relative took the same medication and was a "nut," "insinuating that Bennett himself must be a nut."  (*Id.*)  Bennett also claims that Crauswell's email to Barber in which Crauswell said that Bennett had missed work

due to "nerves problems" further reflects Crauswell's inclination to belittle and stereotype Bennett based on his disability.

It is possible for an employer's disparaging comments about an employee to raise a triable issue of fact as to whether the employee was regarded as disabled.  *See Shaver v. Independent Stave Co.*, 350 F.3d 716, 720-21 (8th Cir. 2003) (holding that a reasonable jury could find that the plaintiff was disabled because he was regarded as limited in the major life activity of thinking where employee's supervisors and coworkers began harassing him and calling him "platehead," "stupid," and "not playing with a full deck" after learning that the employee had had metal plates inserted into his head to treat his epilepsy).  However, where a defendant demeans and insults a plaintiff due to the plaintiff's impairment, but continues to otherwise *treat* the plaintiff the same as other non-disabled individuals, courts have held that the defendant does not regard the plaintiff as disabled.  For instance, the Eighth Circuit has held that a teacher who called a student who received special education services "retarded," "dumb," and "stupid," even after learning that the child had begun mental health counseling and often in response to the student's request for after-school help, did not regard the student as disabled under the ADA.  *Costello v. Mitchell Public School Dist. 79*, 266 F.3d 916 (8th Cir. 2001).  The court held that

> [t]he evidence shows that the defendants treated [plaintiff] as if she was [a] student without a substantially limiting impairment.  Indeed, the main thrust of the plaintiff's IDEA claims is that [plaintiff's school] did not treat plaintiff as

> disabled when it should have. [The teacher's] name-calling alone is insufficient
> to raise a genuine issue of material fact on the matter.

*Id.* at 924.  Other courts have reached the same conclusion in the employment context.

*See Cook v. Cub Foods, Inc.*, 99 F. Supp. 2d 945 (N.D. Ill. 2000) (rejecting plaintiff's

claim that a supervisor's calling plaintiff a "retard" created a triable issue as to whether the

supervisor regarded the plaintiff as disabled, noting that the statement "only shows that

Siwicki was cruel and insensitive to Cook, not that [defendant] treated him in such a way

as to indicate that it perceived him to be substantially limited in a major life activity");

*Crawford v. AT&T*, 177 F. Supp. 2d 1293 (N.D. Ga. 2000) (alleged statement made by

union representative who handled plaintiff's grievance that plaintiff was "crazy" was not

enough to show that union treated plaintiff as substantially limited in a major life activity).

Importantly, even if Bennett was terminated because of an impairment, he cannot

recover under the ADA unless Crauswell perceived him to have an impairment that rises

to the level of a disability.  *Hall v. Masterlock, Co., Inc.*, 1999 WL 1458673 at *12 (M.D.

Ala. Aug. 12, 1999) (citing *Skorup v. Modern Door Corp.*, 153 F.3d 512, 514 (7th Cir.

1998)).  "The [ADA] is not a general protection of medically afflicted persons. . . If the

employer discriminates against them on account of their being (or being believed by him

to be) ill, even permanently ill, but not disabled, there is no violation."  *Id.* (internal

quotation marks and citations omitted).

The court finds that Crauswell's comments to Bennett, while perhaps "cruel and insensitive," do not demonstrate that Crauswell perceived Bennett as having a substantially limiting impairment that rises to the level of a disability under the ADA. *Cook*, 99 F. Supp. 2d at 952.  While Bennett claims that Crauswell began to do things to try to humiliate or insult him after learning that Bennett was on Celexa, Bennett admits that Crauswell did not otherwise treat him differently in the workplace after learning of Bennett's medication, except that Crauswell began to watch him more closely.  (Doc. 17-1 at 204-05, Bennett Depo.); *see Toedtli v. Gillette Co.*, 1999 WL 186607 (N.D. Ga. Feb. 17, 1999), *aff'd*, 202 F.3d 288 (11th Cir. 1999) ("Rather than perceiving [plaintiff] as impaired, the evidence suggests that Gillette expected him to fully and vigorously perform his job duties.").  Although Crauswell had noticed that Bennett's work quality had decreased somewhat since his first period of employment at Brookdale, "[t]he mere fact that the defendant found the plaintiff's work performance to be deficient . . . is not sufficient to show that he was substantially limited in his ability to work or to think due to his [impairment]." *Blackston*, 2000 WL 122109, at *4 (holding that employer did not regard plaintiff as disabled where employer knew about plaintiff's attention deficit disorder, the company viewed plaintiff's disorder as contributing to his poor work performance, and the employer felt that the plaintiff "just couldn't do it").  The undisputed evidence shows that, despite his insulting remarks, Crauswell did not perceive Bennett to have a disability under the ADA.

Because the court finds that Bennett cannot prove that he was disabled under any of the three definitions of disability under the ADA, the court need not examine the remaining elements of Bennett's prima facie case of disability discrimination.  The court finds that Bennett's termination claim must be denied because he has not met his burden of providing sufficient evidence to show that he was disabled while employed at Brookdale in 2008, and therefore, has failed to meet his burden of establishing a prima facie case of disability discrimination by a preponderance of the evidence.  Therefore, Brookdale is entitled to judgment as a matter of law on Bennett's ADA Termination claim.

**B.  ADA Accommodation Claim**

Under the ADA, if a qualified individual with a known disability requires a reasonable accommodation to perform the essential functions of her job, then the employer must provide the accommodation unless the employer can demonstrate that doing so would constitute an undue hardship.  *Davis*, 205 F.3d at  1305; *Talavera v. School Bd. of Palm Beach County*, 129 F.3d 1214, 1217 (11th Cir. 1997) (citing 42 U.S.C. § 12112(b)(5)(A)).  Reasonable accommodations may include job restructuring, part-time or modified work schedules, and acquisition or modification of equipment or devices.  *Talavera*, 129 F.3d at 1217 (citing 42 U.S.C. § 12111(9)).  Because there is no genuine issue of material fact as to whether Bennett has a disability, real or perceived, he has not established a prima facie case.  Assuming, however, that he had made such a showing,

Brookdale next argues that Bennett's accommodation claim must fail because Bennett never requested an accommodation, or, in the alternative, that his desired accommodation is unreasonable.

An employer's "duty to provide a reasonable accommodation is not triggered until the plaintiff makes a 'specific demand' for an accommodation." *Rylee v. Chapman*, 316 Fed. Appx. 901, 906 (11th Cir. 2009) (citing *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363 (11th Cir. 1999)).  Bennett claims that he gave notice to Crauswell of his need for an accommodation in the conversations he had with Crauswell where he requested to going back to the "old way," and that Crauswell should have known that Bennett was referring to working alone because he worked by himself during his first period of employment at Brookdale.  (Doc. 21 at 32; Doc. 17-1 at 137-38, Bennett Depo.)  Since Bennett testified in his deposition that he does not recall ever asking Nancy Barber for an accommodation, Bennett's requests to Crauswell to return to the "old way" are the only evidence in the record that can be construed as a request for accommodation.  The court finds that a request to return to the "old way" of working does not amount to a "specific demand" for accommodation under the ADA.  Bennett never told Crauswell that he *needed* to work alone in order to perform the essential functions of his job, just that he preferred to do so.  Moreover, Bennett's own testimony refutes the suggestion that he requires such an accommodation, since he stated in his deposition that he can "work and

do [his] job, whatever is required of [him]," when other people are around.  (Doc. 17-1 at 134, Bennett Depo.)  This negates any alleged need to work alone.

Next, assuming that Bennett did require the accommodation of working alone to perform his job and that he made the specific request to Crauswell, Brookdale contends that such an accommodation would pose an undue hardship on Brookdale, as it would counteract Brookdale's ability to turn over apartments quickly at the retirement community.   An "undue hardship" is defined as "significant difficulty or expense incurred by a covered entity." 29 C.F.R. § 1630.2(p)(1).  In determining whether a requested accommodation is unreasonable and causes an undue hardship, the EEOC regulations instruct that the following factors should be considered:

> (i) The nature and net cost of the accommodation needed under this part, taking into consideration the availability of tax credits and deductions, and/or outside funding;
>
> (ii) The overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources;
>
> (iii) The overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type and location of its facilities;
>
> (iv) The type of operation or operations of the covered entity, including the composition, structure and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity; and
>
> (v) The impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business.

29 C.F.R. § 1630.2(p)(2)(i)-(v).  Further, in providing accommodations, an employer "is not required to reallocate essential functions [of a job].  The essential functions are by definition those that the individual who holds the job would have to perform, with or without reasonable accommodation, in order to be considered qualified for the position." 29 C.F.R. § 1630.2(o)(App.); *see also Larkins v. CIBA Vision Corp.*, 858 F. Supp. 1572 (N.D. Ga. 1994) (holding that employee's request that she not have to answer telephone calls was an unreasonable accommodation as using the telephone was an essential function of employee's job as a customer service representative).

Maintenance Technicians at Brookdale are responsible for turning over apartments when there is a vacancy and preparing the apartments for new residents, such as when a resident dies and a new resident is going to move in.  As part of the turnover process, the rooms must be repainted.  Brookdale asserts that allowing Maintenance Technicians to work alone would slow down the turnover process, and the room would not be ready for the new resident to occupy on the short timeframe.  (Doc. 16 at 33-34; *see* Doc. 17-8 ¶ 5, Crauswell Decl.; Doc. 17-9 ¶ 18, Barber Decl.)  The court agrees with Brookdale that such an accommodation would be unreasonable and would pose an undue hardship on Brookdale in light of the needs of the retirement community.  The fourth and fifth factors listed above, directing the court to consider the "type of operation" of the covered entity and the "impact of the accommodation upon the operation of the facility" are particularly relevant here.  The nature of Brookdale's operations is providing homes for the elderly,

43

and in order to do so, Brookdale must be able to renovate old apartments in time for new residents to move in.  Allowing painters to work in rooms by themselves at all times would slow down the move-in process and have a great impact on Brookdale's operations.

Importantly, Brookdale is not required to alleviate Bennett's irritation caused by others talking near him by allowing him to work alone, particularly when he can perform the job without such an accommodation.  The Eighth Circuit Court of Appeals has held that employers are not required to create an "aggravation-free environment" for employees.  *Cannice v. Norwest Bank Iowa N.A.*, 189 F.3d 723, 728 (8th Cir. 1999).  In *Cannice*, the court held that the employer was not required to provide a private, unmonitored telephone line for an employee who suffered from depression so that he could call his doctor, family, or friends when he suffered from panic attacks.  *Id*.  The court pointed out that "[t]here is no evidence . . . that the lack of a private telephone line impaired [plaintiff's] ability to work or aggravated his disability. . . At worst, he was made anxious by the knowledge that his own telephone was monitored and that the other telephones were some distance away."  Bennett's desire to work by himself is comparable to the request of the plaintiff in *Cannice*.  Both plaintiffs would feel better with the requested accommodation, but they can do their work without it.  Bennett has not alleged that working with others aggravates his depression and he admitted in his deposition that he can still perform his job in the company of others.  (Doc. 17-1 at 134, Bennett Depo.)

Brookdale is not obligated under the ADA to remedy the fact that Bennett may be "at worst" anxious or irritated by working with others.

For these reasons, the court finds that Bennett's accommodation claim must be denied because a reasonable jury could not conclude that Bennett required an accommodation to perform his job or that he requested a reasonable accommodation. Therefore, Brookdale is entitled to judgment as a matter of law on Bennett's ADA Accommodation claim.

## IV.  CONCLUSION

For the foregoing reasons, the court is of the opinion that Brookdale's Motion for Summary Judgment, (Doc. 15), is due to be granted with respect to Bennett's ADA Termination and Accommodation claims.  An order granting Brookdale's Motion will be entered contemporaneously with this opinion.

**DONE** this 14th day of September, 2011.


*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE